IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| Julianna G., a minor, by and through her Parents, C.G. and D.G. of Kennett Square, PA | : : : : |
| Plaintiffs | : Civil Action : |
| v. | : No. : |
| UNIONVILLE-CHADDS FORD SCHOOL DISTRICT 740 Unionville Road Kennett Square, PA, 19382 | : Jury Trial Demanded : : : : |
| Defendant | : : |

## COMPLAINT

### I.  Preliminary Statement

1. This action is brought by Julianna G., a student with disabilities, and her parents C.G. and D.G. (collectively referred to as "Plaintiffs"), against Defendant Unionville-Chadds Ford School District (the "District") seeking compensatory damages and reasonable attorneys fees and costs under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §§ 794 and 794(a) ("Section 504"); the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12131 et seq.; and 42 U.S.C. § 1983.

2. Due to ongoing medical issues, of which the District was specifically aware, Julianna was, in the Fall of 2013 and Winter of 2014, medically restricted from participating in gym classes in school. Julianna suffered a concussion in school in October 2013 while in school, and her doctors specifically instructed that Julianna should not participate in gym class or any physical activities while in school. Indeed, Julianna's doctors had made such recommendations even before her October 2013 concussion due to ongoing physical and neurological conditions, which caused migraine headaches, spasms, and seizure-like conditions. These recommendations

were provided to the District on numerous occasions, and the District purported to share the medical recommendations with Julianna's teachers.

3. While Julianna's Health Plans created by the District stated that she could not participate in activities involving contact or climbing, those Health Plans inexplicably did not, against clear medical advice, restrict Julianna from participating in gym class. Again, the District purported to distribute Julianna's Health Plan to her teachers.

4. In direct defiance of her Julianna's doctors' recommendations, and its own Health Plans, the District, through Julianna's gym teacher, on February 11, 2014, required her to participate in a contact activity in gym called "keep away." During the game, Julianna collided with another student, fell to the ground, and struck her head, resulting in a second concussion to Julianna within a matter of months. Julianna, who had only recently begun to recover from her previous concussion, suffered an immediate setback. The injury resulted in ongoing physical symptoms and emotional trauma. The District's actions were in deliberate, direct defiance of Julianna's doctors' orders and the District's own Health Plans. The District's actions placed Julianna in a position of extreme vulnerability and danger, and led directly to her suffering an entirely preventable, and serious, neurological injury.

## II. Parties

5. Julianna, at all relevant times to this action, has resided in or around Kennett Square, Pennsylvania, and within the boundaries of the District. At all relevant times, she has been identified as an eligible disabled student pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400 *et seq.*, and is also a protected handicapped student under Section 504 and the ADA.

6. C.G. and D.G. are Julianna's parents. At all times relevant to this action, they

have resided in or around Kennett Square, Pennsylvania, and within the boundaries of the District.

7.  Defendant Unionville-Chadds Ford School District is located at 740 Unionville Road, Kennett Square, PA, 19382. During all times relevant to this complaint, the District was the recipient of several sources of federal funds.

### III. Jurisdiction and Venue

8.  This Court has original jurisdiction over this appeal pursuant to 28 U.S.C. § 1331 because this case raises federal questions under Section 504, the ADA, and Section 1983. The amount in controversy, exclusive of interest and costs, exceeds $75,000.

9.  All of the Defendant's actions complained of herein have taken place within the jurisdiction of the United States District Court for the Eastern District of Pennsylvania. Venue is appropriate in this District pursuant to 28 U.S.C. § 1391.

### IV. Additional Facts Supporting Liability

10. In seventh grade, in 2011, Julianna was diagnosed with Chiari Type I Malformation. A Chiari Type I Malformation is a condition in which brain tissue extends into the spinal canal. It occurs when part of the skull is abnormally small or misshapen, pressing on the brain and forcing it downward. Individuals with a Chiari Malformation may complain of neck pain, balance problems, muscle weakness, numbness or other abnormal feelings in the arms or legs, dizziness, vision problems, difficulty swallowing, ringing or buzzing in the ears, hearing loss, vomiting, insomnia, depression, or headache made worse by coughing or straining. Hand coordination and fine motor skills may be affected.

11. A Type I Chiari Malformation involves the extension of the cerebellar tonsils (the lower part of the cerebellum) into the foramen magnum, without involving the brain stem. This

condition is usually first noticed in adolescence or adulthood, often by accident during an examination for another condition. In Julianna's case, her condition was diagnosed after a volleyball accident in school in which her neck was injured. She developed headaches, neck and wrist pain, and repetitive right arm movements. Because of the diagnosis of a Chiari Malformation, Julianna and her parents had her assessed by a specialist at Duke University Hospital.

12. On May 20, 2011, Dr. Donna Stephenson, a neurologist at the Children's Hospital of Philadelphia ("CHOP") wrote the District stating that Julianna was under her care for muscle spasm and tremor. The letter required that Julianna be allowed to participate only "in non-contact and non climbing activities (she can walk, run and do cardio exercise)." Thereafter, the District incorporated this medical requirement into a Student Individual Health Plan dated June 3, 2011: "Julianna may participate in non-contact and non-climbing activities (she may walk, run, and do cardio exercise." Notably, this medical requirement appeared in *all* of Julianna's subsequent Health Plans during the time period at issue.

13. In October 2011, when Julianna was in eighth grade, it was determined that she required decompression surgery to address the Chiari Malformation. The surgery, which was performed at Duke, went well. However, a second surgery was later required when Julianna experienced severe pain at the incision site and in her neck and shoulder, due to an infection.

14. After surgery, Julianna began experiencing non-epileptic seizures, severe neck spasms, and migraine headaches, which is common in individuals with Chiari formations. These symptoms were exacerbated by anxiety and stress.

15. In December 2012, Julianna developed debilitating pain in her neck and back and was absent for 2 months of school due to medical necessity in January and February 2013. She

4

received homebound instruction at that time. While at home, she continued to have non-epileptic episodes, increasing in number to 6-7 times per day for 45 minutes or more. A team of physicians conducted an evaluation in August 2013 reporting that Julianna had a non-epileptic seizure disorder. Starting in Spring 2013, Julianna was able to attend school on a modified schedule through the end of the school year.

16. A.I. DuPont Hospital for Children, where Julianna had been receiving her local care, sent letters to the District in September 2013 stating that Julianna was medically cleared to return to school, asking for modifications in her school schedule and setting forth what the school should do in the event of an episode at school.

17. While at school, Julianna continued to experience episodes of dizziness and seizure-like episodes, and had to go to the nurse's office for treatment of these episodes on numerous occasions.

18. On October 10, 2013, Julianna experienced a concussion at school when she lost her balance and fell while visiting the nurse's office. Immediately after she hit her head, Julianna experienced a "seizure-like episode, lasting for approx. 25 min." The school nurse called Julianna's mother to report what had happened. Julianna was evaluated by her pediatrician at Brandywine Pediatrics, who diagnosed Julianna with a concussion. Julianna was further evaluated by Dr. Nicole Marcantuano of Nemour DuPont Pediatrics, a specialist in concussions and rehabilitation, on October 18, 2013. Dr. Marcantuano confirmed the diagnosis of a concussion.

19. On October 28, 2013, and again on November 11, 2013, Dr. Marcantuano sent a "To whom it may concern" letter to the District containing new, critical medical recommendations for the District to follow with regard to Julianna's concussion. The letter

indicated that Julianna return to school on a shortened (three hours per day) schedule. The letter also clearly stated that Julianna have "*no physical education/gym class*, sports, physical activity/exercise, recess." (Emphasis added). Dr. Marcantuono specifically requested that "all teachers working with [Julianna] be provided this information."

20. Following her concussion, the District on several occasions sent a form to Julianna's medical providers requesting information regarding appropriate restrictions on Julianna's activities in the school setting. Practitioners from DuPont filled out the form on October 28, 2013, and again on December 5, 2013. The form reiterated, among other things, that Julianna was to have "*No physical education classes*." (Emphasis added). This form was returned to the District at the District's request. The same day, Advanced Practice Nurse Jennette Firlein sent another "To whom it may concern" letter to the District, reiterating that Julianna was to not participate in gym class or physical activities, and again requested that the information in the letter be provided to all of Julianna's teachers.

21. The clear, multiple requirements of Julianna's medical providers were not followed. Most glaringly, the District's subsequent Health Plan *did not* restrict Julianna from participating in gym class or physical activities, as had been medically recommended. The District's post-concussion Individual Health Plans, dated December 2, 2013, and December 13, 2013, both noted that, at that time, Julianna was experiencing non-epileptic seizures and ongoing concussion symptoms, as well as headaches and chronic pain but, rather than barring Julianna from gym class and physical activities as medically indicated by her medical providers, instead stated, as in her previous pre-concussion Health Plans, that Julianna was permitted to participate in "non-contact and non-climbing activities (she may walk, run and do cardio exercise)." Thus, despite receiving new, critical information from Julianna's health care providers that, following

her concussion, she was medically not allowed to participate in gym class *at all*, the District did not incorporate this information into her post-concussion Health Plans.

22.    Julianna's incomplete and inadequate Health Plan was specifically incorporated into Julianna's Individualized Educational Plan ("IEP") dated December 13, 2013. The IEP, in the section setting forth Modifications and Specially Designed Instruction ("SDI"), stated: "School staff will follow Julianna's Health Plan, in Section II, Functional Performance, of this IEP (important items from this plan are listed below)." Among the items from Julianna's Health Plan that were specifically listed in her IEP was: "Julianna may participate in non-contact and non-climbing activities in physical education classes (she may walk, run, and do cardio exercise) when she is not experiencing headache, pain, and/or episodes/spasms." Neither the IEP, nor the Health Plan, restricted Julianna from participating in gym class, as was medically indicated and required.

23.    On February 11, 2014, Julianna, due entirely to the District's failures to follow Julianna's doctors' medical requirements for Julianna, or even its own incomplete Health Plan and IEP, experienced another concussion at school. On that day, Julianna's gym, who was ostensibly informed of the restrictions regarding Julianna's participation in gym class, nevertheless required Julianna to participate in a team ball sport called "keep away" that involved an obvious likelihood of physical contact between Julianna and other students. At the outset of the class, Julianna told the gym teacher, a District employee, that she was medically not allowed to participate in such activities. Despite this knowledge, the gym teacher told Julianna that she was required to participate. Forcing Julianna to participate in this prohibited activity against clear medical mandates, and in violation of Julianna's Health Plan and IEP, placed Julianna in a position of obvious and serious danger that she would not have experienced absent

the actions of the District.

24. During the game of "keep away," Julianna collided with another student, fell to the floor, and hit her head in the same place where she had during her previous concussion incident in October 2013. Following the impact, Julianna went to the school nurse. She remembered playing the game, getting changed in the locker room following the impact, and walking to the school nurse accompanied by a friend; however, she did not remember hitting her head. The school nurse called Julianna's mother, who arrived to pick her up from school. Julianna was transported to her mother's car via a wheelchair.

25. A Comprehensive Medical Report generated by the District dated April 11, 2014 noted that, on December 9, 2013, the District "Rec'd an updated Dr.'s note regarding her concussion. E-mail sent to teachers and counselor with attached Dr.'s note listing the recommended accommodations." Thus, it is clear that the District knew that Julianna should not have been participating in gym class *at all*, much less where she was forced to participate in an activity that involved a likelihood for injury given her several medical conditions, including her recent concussion.

26. On February 17, 2014, Dr. Nicole Marcantuono at Nemours DuPont Pediatrics wrote another medical recommendation letter stating that Julianna had experienced a concussion on February 11, 2014 while in gym class at school, ***"in which she should not have been participating due to previous concussion in October 2013."*** (Emphasis added). The letter contained a long list of recommendations for Julianna including, again, "no physical education/gym class."

27. Following her second concussion, Julianna was again evaluated on February 25, 2014 by Brandywine Pediatrics. Her symptoms were noted to include light sensitivity, fatigue,

feeling mentally foggy, drowsiness, and memory problems. She was initially permitted to return to school no earlier than early March 2014, with a shortened day of 4 hours.

28.  Julianna's second concussion, which was due directly to the District's deliberate failure to follow requirements from Julianna's medical providers, as well as its own Health Plans and IEP, resulted in significant damages to Julianna, including physical injury, pain, suffering, and emotional trauma. Moreover, her concussion puts Julianna at a greater risk of experiencing additional concussions in the future, with more severe symptoms than if she had not previously experienced a second concussion.

## V.   CLAIMS ASSERTED

### COUNT I – CLAIMS BASED UPON SECTION 504

29.  Plaintiffs incorporate by reference all preceding paragraphs in this Complaint.

30.  Section 504 provides protections for children with disabilities by prohibiting discrimination against handicapped persons in federally funded programs such as public education. Section 504 and its regulations require the identification of all disabled children and the provision of appropriate educational services. 29 U.S.C. § 794; 34 C.F.R. §104.1 et seq.

31.  Under Section 504, a "handicapped person" is defined as "any person who has a physical or mental impairment which substantially limits one or more major life activities." 34 C.F.R.§104.3. The term "physical or mental impairment" is defined as "any physical or psychological disorder such as . . . emotional or mental illness and specific learning disabilities." Id. The term "major life activities" is defined as "functions such as caring for one's self . . . learning, and working." Id.

32.  Under Section 504, recipients of federal funds are required to "provide a free appropriate public education to each qualified handicapped person who is in the recipient's

jurisdiction, regardless of the nature or severity of the person's handicap." 34 C.F.R. § 104.33(a). The term "appropriate education" is defined as "the provision of regular or special education and related aids and services that (i) are designed to meet individual educational needs of the handicapped persons as adequately as the needs of non-handicapped persons are met, and (ii) are based on adherence to the procedures that satisfy the requirements of Section 104.34, 104.35."

33. Where a Local Educational Agency ("LEA") undertakes to provide educational services to a student and the LEA fails to provide a free appropriate public education ("FAPE"), the LEA is liable under Section 504. See Adam C. v. Scranton School Dist., 2011 WL 4072756, at *7 (M.D. Pa. Sept. 13, 2011); Vicky M. v. Northeastern Educational Intermediate Unit, 2009 WL 4044711, at *6 (M.D. Pa. Nov. 20, 2009).

34. The rights bestowed upon students and families by Section 504 are enforceable through administrative and judicial procedures, although Pennsylvania administrative process under Section 504 fails to provide the "review procedure" required by federal law. 20 U.S.C. § 1415; 34 C.F.R. §§ 104.36, 300.507, 300.510, 300.512. Moreover, neither compensatory damages nor attorneys' fees are available to plaintiffs at these administrative levels, and no administrative process exists in Pennsylvania for claims under the ADA.

35. Except for a modest difference in the causation element, "Section 504 and ADA claims are subject to the same analysis and thus may be addressed at the same time." Patrick B. v. Paradise Protectory and Agr. School, Inc., 2012 WL 3233036, at *4 (M.D. Pa. Aug. 6, 2012) (citing Baker v. Southern York Area School Dist., 2009 U.S. Dist. LEXIS 114375, *6–7, n. 3, 2009 WL 4793954 (E.D. Pa. Dec. 8, 2009)).

36. Section 504 and the ADA provide that an aggrieved party has the right to bring a

civil action for compensatory damages in federal district court. <u>Chambers v. School Dist. of Philadelphia Bd. of Educ.</u>, 587 F.3d 176, 189, 197 (3d Cir. 2009).

37. Plaintiffs are not required to exhaust their administrative remedies with respect to relief such as monetary damages that is not available in administrative proceedings prior to bringing an action in federal district court. <u>Patrick B. v. Paradise Protectory and Agr. School, Inc.</u>, 2012 WL 1079127, at *4 (M.D. Pa. March 30, 2012); <u>W. B. v. Matula</u>, 67 F.3d 484, 496 (3d Cir. 1995), <u>abrogated on different grounds</u>, <u>A.W. v. Jersey City Public Schools</u>, 486 F.3d 791 (3rd Cir. 2007); <u>M.C. v. Perkiomen Valley School District</u>, 2015 WL 2231915 at *8 (E.D. Pa. May 11, 2015) (exhaustion is not required where plaintiff has not pleaded "educational issues" or injury that could have been resolved by the administrative process); <u>Akil Abasi F. v. Pressley Ridge School for the Deaf</u>, No. 14–335 (ORDER) (E.D. Pa. Oct. 28, 2014) (exhaustion is not required where plaintiffs seek compensatory damages that are not available through administrative process and injuries are "non-educational" in nature).

38. Exhaustion is also not required because Plaintiff could not have asserted her claims under Section 1983 and the ADA in the administrative process, nor obtained any monetary relief for her physical and emotional injuries pursuant to the administrative process.

39. A court may award monetary damages to an aggrieved parent or child with disabilities who brings a claim under Section 504 or the ADA. <u>Chambers</u>, 587 F.3d at 189; <u>Matula</u>, 67 F.3d at 495; <u>Bucks County Dept. of Mental Health/Mental Retardation v. Commonwealth of Pennsylvania</u>, 379 F.3d 61, 68 n. 5 (3d Cir. 2004). See also <u>Enright v. Springfield Sch. Dist.</u>, 2007 WL 4570970, at *10-11 (E.D. Pa. Dec. 27, 2007); <u>Susavage v. Bucks Cty. Intermediate Unit 22</u>, 2002 WL 109615, at *20 (E.D. Pa. 2002). Aside from the <u>Enright</u> and <u>Susavage</u> decisions, both of which resulted in monetary damages under Section 504,

a plethora of other decisions fully support monetary damages under Section 504 and the ADA. Patrick B. v. Paradise Protectory and Agr. School, Inc., 2012 WL 3233036, at *4 (M.D. Pa. Aug. 6, 2012) ("compensatory damages, while not available under the IDEA, are available under Section 504 and the ADA"); Chambers, 587 F.3d at 189; A.W. v. Jersey City Public Schools, 486 F.3d 791, 804 (3d Cir. 2007) ("The remedies for violation of Section 504 are coextensive with the remedies available in a private cause of action brought under Title VI of the Civil Rights Act of 1964. These remedies include compensatory damages, injunctive relief, and other forms of relief traditionally available in suits for breach of contract.") (citations omitted)); Jeremy H. v. Mount Lebanon School Dist., 95 F.3d 272, 279 (3d Cir. 1996); Matula, 67 F.3d at 494 (partially abrogated on grounds other than Section 504 by A.W.) ("[P]laintiffs may seek monetary damages directly under § 504, based on the general presumption that all appropriate remedies are available unless Congress has expressly indicated otherwise.") (internal quotations omitted); Neena S. v. School Dist. of Phila., 2008 WL 5273546, *15 (E.D. Pa. Dec.19, 2008) (treating Matula's holding regarding the availability of compensatory damages under Section 504 as continuing to be authoritative); Brandon V. v. Chichester Sch. Dist., 2007 WL 2155722, at *3 (E.D. Pa. July 25, 2007) (same); L.T. ex rel. B.T. v. Mansfield Township Sch. Dist., 2009 WL 737108, at *8 (D. N.J. March 17, 2009).

    40. Both Section 504 and the ADA permit recovery of reasonable attorneys' fees by parents who are "prevailing parties" in an action or proceeding under those statutes. 42 U.S.C. § 12205; 29 U.S.C. § 794(b).

    41. Here, Julianna is a protected handicapped student under Section 504 due to her history of medical issues, which, at relevant times, substantially limited one or more of her major life activities, including but not limited to physical activity, learning and her emotional well-

being, while she attended school in the District. Julianna was also otherwise qualified to participate in her program at the District.

42. At all relevant times, the District received federal financial assistance from several sources.

43. The District discriminated against Julianna, and denied her the equal benefits of her educational program, by failing to provide her with a safe, appropriate, and properly supervised educational program, ultimately causing the injuries described herein.

44. Julianna was deprived of the equal benefits of her program, and otherwise subject to discrimination, because of her disabilities. Defendant Unionville-Chadds Ford School District acted in bad faith, used gross misjudgment, and/or was deliberately indifferent to Julianna's rights.

45. As a result of these violations, M.C. suffered damages as described herein.

## COUNT II – CLAIMS BASED UPON ADA

46. Plaintiffs incorporate by reference all preceding paragraphs in this Complaint.

47. To prevail on a violation of either Section 504 or the ADA, a plaintiff must allege and demonstrate that an individual (1) has a disability; (2) was otherwise qualified to participate in a school program; and (3) was denied the benefits of the program or was otherwise subject to discrimination because of his disability. See Adam C. v. Scranton School Dist., 2011 WL 4072756, at *7 (M.D. Pa. Sept. 13, 2011); Vicky M. v. Northeastern Educational Intermediate Unit, 2009 WL 4044711, at *6 (M.D. Pa. Nov. 20, 2009). The requirements for a claim under Section 504 are largely the same as those under the ADA. See Helen L. v. DiDario, 46 F.3d 325, 330 n. 7 (3d Cir.1995); Patrick B. v. Paradise Protectory and Agr. School, Inc., 2012 WL 3233036, at *4 (M.D. Pa. Aug. 6, 2012) (citing Baker v. Southern York Area School Dist., 2009

13

U.S. Dist. LEXIS 114375, *6–7, n. 3, 2009 WL 4793954 (E.D. Pa. Dec. 8, 2009)). However, the ADA has a less stringent causation standard, requiring only that the plaintiff plead and prove that she would not have been deprived of benefits but for her disability. New Directions Treatment Servs. v. City of Reading, 490 F.3d 293, 300 n. 4 (3d Cir.2007) (reversing the denial of summary judgment in favor of plaintiff in part because the District Court improperly applied Section 504's sole causation requirement to plaintiff's ADA claim, which required only "but for" causation).

48. Defendant's actions as set forth above have caused Julianna to be denied a safe, appropriate educational program and placement at all times relevant to this Complaint in violation of the ADA, and resulted in the injuries and damages set forth herein.

49. Defendant discriminated against Julianna by failing to provide her with a safe, appropriate, and properly supervised educational program ultimately causing the abuse described herein.

50. Julianna was deprived of the equal benefits of her program, and otherwise subject to discrimination, because of her disability. Defendants acted in bad faith, used gross misjudgment, and/or were deliberately indifferent Julianna's rights.

51. As a result of these violations, Julianna suffered damages as described herein.

### COUNT III – CLAIMS BASED UPON 42 U.S.C. SECTION 1983 BASED ON STATE-CREATED DANGER

52. Plaintiffs incorporate by reference all preceding paragraphs in this Complaint.

53. Section 1983 imposes civil liability upon any person who, acting under color of state law, deprives an individual of any rights, privileges, or immunities secured by the Constitution of laws of the United States. Shuman v. Penn Manor School Dist., 422 F.3d 141, 146 (3d Cir. 2005); K.S. v. School Dist. of Phila., 2007 WL 1009815 at *3 (E.D. Pa. 2007).

54. At all relevant times, the District and its employees, agents and/or officers were

14

acting under color of state law.

55. To prevail on a Section 1983 claim under a state-created danger theory, a plaintiff must plead and prove the following four elements: (1) the harm ultimately caused was foreseeable and fairly direct; (2) a state actor acted with a degree of culpability that shocks the conscience; (3) a relationship between the state and the plaintiff existed such that the plaintiff was a foreseeable victim of the defendant's acts, or a member of a discrete class of persons subjected to the potential harm brought about by the state's actions, as opposed to a member of the public in general; and (4) a state actor affirmatively used his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all. Billingsley v. Franklin Area School Dist., 2012 WL 259992 at *5 (W.D. Pa. Jan. 27, 2012) (citing Bright v. Westmoreland County, 414 F.3d 276, 281 (3d Cir. 2006); K.S.S. v. Montgomery County Bd. of Commissioners, 871 F. Supp.2d 389, 399-400 (E.D. Pa. 2012).

56. The District violated Julianna's Fourteenth Amendment right to bodily integrity by knowingly and deliberately placing her in a position where she could suffer a serious injury such as a concussion. See L.R. v. School Dist. of Phila., 60 F. Supp.2d 584, 588 (E.D. Pa. 2014).

57. The District's actions as described above rendered Julianna more vulnerable to injury from another source than she would have been absent intervention by the District.

58. The harm to Julianna was foreseeable and direct. The District was on longstanding notice that Julianna suffered a debilitating neurological condition, and that this condition manifested itself by, among other symptoms, periods of dizziness and spasms. For these reasons, even before Julianna suffered her first concussion in October 2013, Julianna's medical providers had required that Julianna not participate in contact or climbing activities at

school, and this restriction was contained in the Health Plans that the District wrote. Following her concussion in October 2013, Julianna's doctors required that Julianna not participate in gym class *at all*, and the District was provided with this mandate, yet her Health Plan was not amended to contain this restriction. Despite the doctors' mandates and inappropriate Health Plan ostensibly being distributed to all of Julianna's teachers, and despite knowing that Julianna had suffered an earlier concussion in school, Julianna's gym teacher nevertheless required Julianna to participate in gym class, in an activity that involved the likelihood of physical contact between students. Indeed, that is exactly what happened: Julianna collided with another student, fell to the floor, and hit her head, causing a second concussion.

59. The actions of the District shock the conscience. The District knew that Julianna was particularly vulnerable to injury during gym class, which is why her doctors mandated that she not participate in it *at all*. Indeed, Julianna herself told her gym teacher that she should not be participating in the game of "keep away," yet her gym teacher required that Julianna participate in the game. Here, where the District clearly had time to deliberate and nevertheless: (a) reissued Julianna's Health Plan without the requirement, per her doctors' mandates, that she not participate in gym class; and (b) forced Julianna to participate both in gym class (against her doctors' mandates), and in a contact activity (in violation of the District's own incomplete Health Plan), the District was, at the very least, deliberately indifferent. See K.S. v. School Dist. of Phila., 2007 WL 1009815 at *3 (E.D. Pa. 2007) (where deliberation was possible, and district officials could have acted with "unhurried judgment," showing of deliberate indifference was sufficient to satisfy the "shocks the conscience" prong of the state-created danger test).

60. Julianna was a foreseeable victim of Defendants' actions, which were directed directly at Julianna.

61. Defendant and its agents, officers, and employees, were state actors and affirmatively used their authority in a way that rendered Julianna more vulnerable to danger than if they had not acted at all. Defendant, knowing the medical restrictions placed on Julianna both by her doctors and the District itself, forced her to participate in an activity in gym class that violated both those restrictions and the District's own Health Plan, which was incorporated into Julianna's IEP. Moreover, the District failed to implement policies that would have prevented the harm from Julianna from occurring.

62. The decision to reissue Julianna's Health Plans without the medical requirement that she not participate in gym class was made by District officials with authority to make such decisions, pursuant to District custom, policy, or procedure. Furthermore, Julianna's teacher's affirmative decision to require Julianna to participate in a contact activity in gym class was the result of the District's failure to train and supervise Julianna's teachers regarding the need to follow Health Plans for students like Julianna whose medical issue require that they have such plans.

63. Defendants' actions as described above directly caused Julianna's damages.

## VI. Relief Requested

64. Plaintiffs seek monetary damages and reasonable attorneys' fees and costs under Section 504, the ADA, and Section 1983.

Respectfully submitted,

_____
Michael E. Gehring, Esquire
ID No. 57224

_____
Dennis C. McAndrews, Esquire
ID No. 28012

McANDREWS LAW OFFICES
Attorneys for Plaintiffs
30 Cassatt Avenue
Berwyn, PA
(610) 648-9300 (phone)
(610) 648-0433 (fax)
Attorneys for Plaintiffs